## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NAJAH EDMUNDSON, | ) | 3:21-CV-00758 (SVN) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KLARNA, INC., | ) | |
| *Defendant*. | ) | February 15, 2022 |

## RULING AND ORDER ON DEFENDANT'S MOTION TO COMPEL ARBITRATION

Sarala V. Nagala, United States District Judge.

Najah Edmundson ("Plaintiff") brings the present putative class action alleging that Klarna, Inc. ("Defendant" or "Klarna") deceived customers into using its services by claiming to provide the ability to purchase items, through delayed payments taken from a customer's bank account over time, with the promise that there would be no interest or other fees. Plaintiff alleges that once the customers used the service, however, Klarna allowed financial institutions to overdraw its customers' bank accounts, leading to substantial fees being assessed by the banks, in direct contravention of the promises made by Klarna. Plaintiff brings causes of action for common law fraud and violations of the Connecticut Unfair Trade Practices Act ("CUTPA") on behalf of herself and all those similarly situated.

Presently before the Court is Defendant's Motion to Compel Arbitration (the "Motion"). ECF No. 20. Defendant argues that prior to using its services, all users are required to agree to its terms and conditions. According to Klarna, these terms and conditions include a broad arbitration agreement that would require the present dispute to be arbitrated. Plaintiff asserts that she is not bound by the arbitration agreement because she had no notice, actual or inquiry, that by using Klarna she was agreeing to its terms and conditions or the arbitration provision contained therein. For the reasons discussed below, although the case presents a close question, the Court agrees with

the Plaintiff.  Defendant's motion is therefore DENIED.

## I.    FACTUAL BACKGROUND

### A.    The Instant Lawsuit

The following facts are taken primarily from the Complaint.  Klarna, which was founded in 2005, has become one of the largest "buy now, pay later" services in the United States, serving 90 million shoppers. ECF No. 1 ¶ 16.  Klarna allows shoppers the ability to purchase goods by providing point-of-sale loans for both in-store and online purchases.  *Id.* ¶ 17.  This service is provided to consumers through Klarna's mobile application ("app"), *id.*, and its checkout widget that can be found on certain retail websites that partner with Klarna.  ECF No. 20-1, Memo. In Supp. of Mot. to Compel Arbitration, at 8.  When making a purchase from a merchant that supports Klarna's service, a customer may be asked at checkout whether they would rather use a traditional upfront payment method or Klarna's "buy now, pay later" service.  ECF No. 1 ¶ 19.  If the consumer chooses to use Klarna's service, he or she provides basic information such as name, date of birth, address, and debit card number.  *Id.* ¶ 20.  Klarna will then provide details regarding a payment plan.  *Id*.  Specifically, Klarna breaks up the total purchase price into four equal payments. *Id.* ¶ 21.  The first payment will be charged to the customer's debit card at checkout.  *Id*.  The additional payments will be automatically charged, to the customer's debit card, every two weeks until the balance is paid.  *Id*.

Plaintiff alleges that what makes Klarna different than traditional credit cards is its promise that Klarna's service is "completely free, with no interest or hidden fees." *Id.* ¶¶ 17-18.  Klarna's CEO has stated that Klarna is, "with this product, challenging a massive industry that has overcharged consumers with overdraft fees, with interest bearing terms of use." *Id.* ¶ 23.  Klarna holds itself out as a service that is completely free to use, with a slogan of "No interest. No Catch."

*Id.* ¶ 26.

Through this lawsuit, however, Plaintiff alleges there is one major catch: that Klarna is exposing customers to significant amounts of "interest" in the form of bank overdraft fees. *Id.* ¶ 27. Plaintiff alleges that, pursuant to her payment plans, on March 6 and March 7, 2021, Klarna made deductions from her checking account of $15.83 and $9.31 respectively. *Id.* ¶¶ 38-39. Each deduction resulted in Plaintiff's account being overdrawn and incurring a $35 overdraft fee. *Id.* Plaintiff alleges that Klarna knew its automatic charges would likely result in overdrawing its user's accounts and that it failed to alert potential users to this risk. *Id.* ¶¶ 41-46. Plaintiff thus claims that Klarna has committed common law fraud and violations of CUTPA.

B.  The Arbitration Dispute

The present motion centers around an arbitration provision in Klarna's terms of service. ECF No. 20-1 at 8. According to a declaration of Klarna Senior Product Manager Erin Riffe, when a consumer shops on a merchant partner's website, the consumer may be offered the ability to pay with Klarna's service during the online checkout process. ECF No. 20-2 ¶ 10 ("Riffe Decl."). Plaintiff created a Klarna account on or about December 23, 2020, in the context of a purchase from the Gamestop website. *Id.* ¶ 9. Attached to the Riffe Declaration are screenshots of what Plaintiff would have seen on the Gamestop website on December 23, 2020. *Id.*, Ex. 1 (ECF No. 20-3) & 2 (ECF No. 20-4).[1] Specifically, if a consumer pursued the "buy now, pay later" option of payment, the consumer could see payment schedules from different "buy now, pay later" vendors. ECF No. 20-4 at 2. At the checkout page, under the heading "Payment Method," there are three buttons for "Credit Card," "Paypal," and "PowerUp Rewards Credit card." *Id.* Then,

---

[1] Plaintiff does not contest that the screen shots accurately depict what she would have seen when she used Gamestop's website and Klarna's checkout widget. As noted below, she initially contested what she would have seen when using Klarna's app.

under the heading "Buy Now Pay Later," there are buttons for three services:  Quadpay, Klarna, and Sezzle.  *Id.*  If a user clicked on the button for Klarna, the screen displayed a box with a grey/brown background with the heading "4 interest-free payments" that described the payment schedule Klarna would use and, in bold black font, the words "Trusted by over 11 million Americans."  *Id.*

Under that box, in a smaller gray font, were the words: "By continuing, I accept **Klarna Service terms**, **Privacy Policy**, **Pay Later in 4 terms** and request electronic communication."  *Id.*  The service terms, privacy policy, and pay later in 4 terms hyperlinks are in black font, on a white background, while the remainder of the sentence consenting to those terms is in gray font on a white background.  *Id.*   The hyperlinked phrases are also underlined and bolded.  *Id.*  Under the sentence with the hyperlinks are two sentences in slightly bigger black print: "Selecting this option will open a Klarna modal to complete your order.  Please note, there will be no order review page."  *Id.*  Finally, below that text is a black "Pay with Klarna" button.  The screenshot provided by Klarna is reproduced below.  *See* ECF No. 20-4 at 2.

It is undisputed that Plaintiff selected the black "Pay with Klarna" button located on the screen and continued with her purchase from Gamestop on December 23, 2020.  ECF No. 20-2 at ¶ 9.[2]  Had Plaintiff clicked on the "Klarna Service terms" hyperlink, Klarna argues, she would have been led to a page entitled "Klarna Services Terms."  The Klarna Services Terms provide: "These terms apply between Klarna Inc., . . . and you when you use Klarna's services and features as described in these terms (the "Services").  You sign up for the Services by accepting these terms."  Riffe Decl., Ex. 3, ECF No. 20-5 at 2.  In those terms, as the first of four bullet points set four lines from the top, was a hyperlink to "Mandatory Arbitration of Disputes."  *Id.*  Had Plaintiff

---

[2] Although Plaintiff did not submit a declaration in conjunction with this motion, the parties agree that Plaintiff did not click on any of the hyperlinks and instead moved forward with her purchase by clicking the "Pay with Klarna" button.

clicked on that link, Klarna says, she would have been taken to the arbitration provision Klarna believes governs here, which is described further below.  Additionally, had Plaintiff clicked on the "Pay later in 4 terms" hyperlink, she would have been led to the "Klarna Pay Later in 4 Agreement."  Riffe Decl., ¶ 13; ECF No. 20-6.  That agreement, under a "Terms and Conditions" heading about halfway down the page, contains a hyperlink to the arbitration agreement as the first of three bullet points.  ECF No. 20-6 at 2.  Klarna argues Plaintiff is bound by both the Klarna Services Terms and the "Pay later in 4 terms" agreements and thus Plaintiff's claims must be arbitrated.  ECF No. 20-1 at 23.

After Plaintiff clicked on the "Pay with Klarna" button to continue with her purchase, but prior to completing it, Plaintiff encountered this screen ("Klarna's Widget"):





Riffe Decl., ¶ 13; ECF No. 20-7.  Plaintiff would have had to first add her debit card information

on the screen labeled "Add your card details" and then click continue; then she would have been

taken to the "Review your plan" screen depicted above.  ECF No. 20-7.  On the "Review your

plan" screen, above the "Confirm and continue" button and below the purchaser's credit card

information is the statement "I agree to the **payment terms.**"  *Id.*  This text is gray on a white

background, with the words payment terms bolded and underlined.  *Id.*  The words "payment

terms" were a hyperlink that would have taken the user to the "Klarna Pay Later in 4 Agreement,"

which had previously been referenced with the hyperlinked text "Pay later in 4 terms" on the prior

page.  ECF No. 20-2 ¶ 13.  Until Plaintiff clicked "Confirm and continue," she would have been

"free to exit the Klarna checkout widget . . . without incurring any fee or penalty, and could have

chosen to use another payment method to complete her purchase."  ECF No. 20-1 at 10, Riffe

Decl., ¶ 14.  According to Klarna, Plaintiff's clicking of "Confirm and continue" became the

second time Plaintiff agreed to a contract containing an arbitration provision.

Klarna further contends there was a third time Plaintiff agreed to arbitrate her claims. On or around December 27, 2020, Plaintiff downloaded Klarna's cell phone application. Riffe Decl., ¶ 18. Prior to using the application, Plaintiff would have encountered an introductory screen depicted in ECF No. 20-8 and below. *Id.*



ECF No. 20-8. This screen ("Klarna's App") presents the user with the options to "Sign up," "Log in," or "Pay in-store." *Id.* Below those options, in white text on a black background are two messages. The first states: "message and data rates may apply." *Id.* The second states: "by clicking 'Sign in' I approve <u>Klarna's User Terms</u> and confirm that I have read <u>Klarna's Privacy Notice</u>. Links in the app are sponsored." *Id.* "Klarna's User Terms" and "Klarna's Privacy Notice" were also hyperlinks. Riffe Decl., ¶ 17. If a customer clicked on the "Klarna's User Terms" hyperlink, he or she would be taken to the same terms that were labeled "Klarna Services Terms" in the link

on the initial Gamestop screen.  *Id.*  It is important to note that despite the language stating, in relevant part, that "by clicking 'Sign in,' I approve Klarna's User Terms," there actually is no "sign in" button displayed on the page.  Rather, there is a "Sign up" button and a "Log in" button.  *Id.*

Klarna contends that each of these screens are independently sufficient to force Plaintiff to arbitrate the present dispute.  Klarna argues that, within the Klarna Services Terms, which was accessible via hyperlink from the first page on the Gamestop website when Plaintiff decided to "Pay with Klarna," there is a broad arbitration provision providing:

> "[The customer] agree[s] that any and all disputes or claims, including without limitation federal and state regulatory and statutory claims, common law claims, and those based in contract, tort, fraud, misrepresentation or any other legal theory, arising out of or relating to these Terms or the relationship between you and Klarna or WebBank and their agents, employees, officers, directors, predecessors in interest, and successors and assigns, shall be resolved exclusively through final and binding arbitration, as set forth in this ("**Arbitration Provision**"), rather than in court, except that you may assert claims in small claims court, if your claims qualify."

ECF No. 20-5 at 13.  The provision also gives customers the option to opt out of arbitration and provides instructions on how to do so if they would prefer.  *Id.*  The arbitration agreement goes on to say, in relevant part: "YOU AGREE THAT EACH PARTY MAY BRING CLAIMS AGAINST THE OTHER ONLY ON AN INDIVIDUAL BASIS AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS."  *Id.* at 14.  Plaintiff concedes that the present case would fall within the scope of the arbitration agreement if the agreement is deemed enforceable as to her.

## II.    LEGAL STANDARD

The Supreme Court has repeatedly made clear that "the FAA was designed to promote arbitration" and the act "embod[ies] [a] national policy favoring arbitration."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 345–46 (2011).  As such, "the Act places arbitration agreements

upon the same footing as other contracts.  But it does not require parties to arbitrate when they have not agreed to do so." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012) (internal quotations omitted).  "Thus, before an agreement to arbitrate can be enforced, the district court must first determine whether such agreement exists between the parties." *Meyer v. Uber Techs.*, Inc., 868 F.3d 66, 73 (2d Cir. 2017).

Whether the parties have agreed to arbitration is a question of state contract law.  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 231 (2d Cir. 2016).  In determining whether the parties have an enforceable agreement to arbitrate, the Court applies the same standard as a summary judgment motion and will "consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits." *Id.*  After examining the relevant evidence, "if a court finds that the parties agreed to arbitrate, it should then consider whether the dispute falls within the scope of the arbitration agreement." *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 26 (2d Cir. 2002).

To form a valid contract under Connecticut law, the parties must show offer and acceptance.  *Auto Glass Exp., Inc. v. Hanover Ins. Co.*, 975 A.2d 1266, 1273-4 (Conn. 2009).  For web-based contracts, "if there is no evidence that the [customer] had actual notice of the terms of the agreement, the [customer] will still be bound by the agreement if a reasonably prudent user would be on inquiry notice of the terms." *Meyer*, 868 F.3d 75.  The parties here agree that Plaintiff did not have actual notice of the arbitration agreement, and instead focus their analysis on whether there was inquiry notice.  Such notice depends on the "clarity and conspicuousness" of the contracts, which are a "function of the design and content of the relevant interface." *Id.*

The Second Circuit has generally recognized four categorical types of web-based agreements: (i) clickwrap; (ii) browsewrap; (iii) scrollwrap; and (iv) sign-in-wrap.  *Id.*; *Feld v.*

*Postmates, Inc*., 442 F. Supp. 3d 825, 829 (S.D.N.Y. 2020); *Applebaum v. Lyft, Inc*., 263 F. Supp. 3d 454, 465 (S.D.N.Y. 2017).  On remand, the district court in the *Nicosia* case also described a fifth category that it called "hybridwrap."  *Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254, 266 (E.D.N.Y. 2019).  Hybridwrap agreements "prompt the user to manifest their assent to particular terms by engaging in some dual-purpose action, such as creating an account, executing a purchase order, or downloading an application."  *Id.* (internal citations omitted).  The classification of the web-based contract, however, is not determinative of the question at issue as "the enforceability of a web-based agreement is clearly a fact-intensive inquiry" that must be examined from "the perspective of a reasonably prudent smartphone" or computer user.  *Meyer*, 868 F.3d at 76.

To the extent relevant, it appears to the Court that the first two possible points at which an agreement was formed—the Gamestop website depicted in ECF No. 20-4 and the Klarna checkout widget depicted in ECF No. 20-7—are best labeled as hybridwrap agreements.  The last possible point at which an agreement was formed—the Klarna app's introductory screen—is probably best characterized as a sign-in wrap agreement.  Sign-in-wrap agreements "do not require the user to click on a box showing acceptance of the 'terms of use' in order to continue.  Rather, the website is designed so that a user is notified of the existence and applicability of the site's 'terms of use' when proceeding through the website's sign-in or login process." *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 399 (E.D.N.Y. 2015).

In determining whether a reasonably prudent user would be on notice of a website's terms and conditions, the Court is guided by a long line of Second Circuit caselaw.  Through these cases, the Second Circuit has provided guidelines on what should be considered when examining whether a plaintiff has inquiry notice of a website's terms and conditions.  As then Judge Sotomayor made clear, one of the most important aspects of inquiry notice is the "clarity and conspicuousness of

arbitration terms." *Specht*, 306 F.3d at 30.  To determine the clarity and conspicuousness of arbitration terms, the Court should consider how crowded a specific webpage is with extraneous information.  *See Nicosia*, 834 F.3d at 236.  The Court must also look to whether the terms and conditions were set off by different fonts, colors, bolding, or other distinctive characteristics that would likely draw a reasonably prudent user's attention to them.  *Starke v. SquareTrade*, 913 F.3d 279, 290-1 (2d Cir. 2019).  The Court should further examine whether the "mechanism for manifesting assent" is temporally and spatially coupled to the customer's use of the website or app's features.  *Schnabel*, 697 F.3d at 127; *see also Nicosia*, 384 F. Supp. 3d at 266 ("Courts will give effect to hybridwrap terms where the button required to perform the action manifesting asset (*e.g.,* signing up for an account or executing a purchase) is located directly next to a hyperlink to the terms and a notice informing the user that, by clicking the button, the user is agreeing to those terms.").  Ultimately, using these factors, the Court must determine whether a "reasonably prudent" user would have been on notice of the terms and conditions at issue.  *Meyer*, 868 F.3d at 77.  As the *Meyer* court noted, it is presumed that a reasonably prudent smartphone user "knows that text that is highlighted in blue and underlined is hyperlinked to another webpage where additional information will be found."  *Id.* at 77-78.

With these principles in mind, the Court examines below each of the three potential points at which Plaintiff could have assented to the terms containing the arbitration agreement.

## III.    DISCUSSION

### A.  The Pay With Klarna Screen

Initially, after selecting the button to use Klarna for her purchase, Plaintiff was confronted with the following screen:

ECF No. 20-4.  Klarna believes that by pressing the "Pay with Klarna" button, and proceeding to the next step in the checkout, Plaintiff agreed to the service terms, including the arbitration agreement.  With respect to the layout of the screen, the Court compares the screen to those at issue in *Nicosia*, where the Second Circuit determined that the notice provided on Amazon.com's checkout page was not sufficient as a matter of law to dismiss the suit in favor of individual arbitration,[3] 834 F.3d at 228, 236, and *Meyer*, in which the Second Circuit granted the defendants' motion to compel arbitration based in part on the uncluttered nature of the relevant screen, 868

---

[3] When faced with the *Nicosia* case again after its initial remand, the Second Circuit ordered arbitration, finding that the plaintiff received notice of the arbitration provision when Amazon filed a motion in the district court "raising the arbitration clause as a ground for dismissal."  *See Nicosia v. Amazon.com, Inc.*, 815 Fed. Appx. 612, 614 (2d Cir. 2020) ("*Nicosia II*").  Given that the plaintiff had made at least 27 purchases from Amazon.com after receiving such notice, the Court concluded that he had assented to the relevant terms, including the arbitration agreement.  *Id.*  Neither party argues here that *Nicosia II*'s holding is relevant to the present matter.

F.3d at 78, 80.  The screen here is not as cluttered as that in *Nicosia,* but it is also not as uncluttered as the screen in *Meyer*.

The Court finds that the screen is more akin to the cluttered screen in *Nicosia* than the cleaner screen in *Meyer*.  First, there are multiple different items attracting the user's attention on this screen.  Initially, the user must select how they intend to pay for their purchase, deciding between no fewer than six different options.  Additionally, in the top right corner of the screen, the customer is reminded of the item to be purchased, including details about the item and its price, and shipping method.  It is likely the customer would focus some attention on that corner of the page, as the customer would want to make sure her order is correct—particularly because the site says that that there "will be no order review page" after leaving the current page.  Given the many competing items as to which a customer would focus her attention on this page, this screen stands in stark contrast to the interface at issue in *Meyer*, which contained nothing but an option to input credit card information and a button to register.  *Meyer*, 686 F.3d at 81.  Thus, with respect to the issue of clutter on the screen, the page here is more similar to the busy Amazon screen in *Nicosia*. 834 F.3d at 240, Addendum B.

Second, the hyperlinks that would lead the customer to the Klarna Services Terms and Pay Later in 4 Terms, most relevantly, are not set off by different fonts or colors sufficient to give a reasonable user notice of their presence.  In fact, the text surrounding the hyperlinked terms and conditions is gray on a white background.  Such color selection certainly does not stand out.  The text containing the hyperlinks is also the smallest text on the screen, even smaller than other disclaimers like "selecting this option will open a Klarna modal to complete your order."  While the hyperlinks themselves are bolded, underlined, and black on a white background, they are not the characteristic blue that a user would associate with hyperlinks.  *See Meyer*, 868 F.3d at 77-8.

Conversely, the "Pay with Klarna" button that the consumer must select to continue with the transaction is much larger and entirely black on a white background.  This button draws the user's eye to it almost at once.  Here, there is nothing about the hyperlinks, or text surrounding them, that would have drawn a user's attention to the links such that the user would be on inquiry notice of the terms in the agreements that were hyperlinked.

Third, the hyperlinks are only minimally spatially related to the place where the user would manifest assent to the terms contained in the hyperlinked agreements.  While the hyperlinked text is located on the same page as the "Pay with Klarna" button, it is not directly above or below that button, as was the case in *Meyer*.  *See also Feld*, 442 F. Supp. 3d at 830.  Rather, between the sentence with the hyperlinks and the Pay with Klarna button is other fine print.  Specifically, in a font size larger than that of the sentence with the hyperlinks, but smaller than that of the Pay with Klarna button, the screen reads: "Selecting this option will open a Klarna Modal to complete your order.  Please note, there will be no order review page."  Thus, the sentence with the hyperlinks is "not directly adjacent to the button intended to manifest assent to the terms," as was the case in *Meyer*, 868 F.3d 78.  Of course, the terms and conditions were not located across the page from the relevant button as was the case in *Nicosia*, but they also were not directly next to the "Pay with Klarna" button, either.

Temporally, too, this purported agreement to the terms and conditions did not take place simultaneously with a user's signing up for Klarna.  Specifically, Klarna's widget, discussed below, appears directly after pressing the Pay with Klarna button.  While it is not the case that the terms and conditions were provided at an entirely different point in time, as was the case in both *Starke* and *Schnabel*, it is unclear in the instant case when the customer would actually become bound by Klarna's Services Terms.  A separate provision of those Services Terms relating to credit

reports suggests that clicking the Pay with Klarna button is merely a "contemplated purchase." ECF No. 20-5 at 5 (noting that the customer authorizes Klarna to obtain consumer reports "when [the customer] elect[s] to view payment options for a *contemplated purchase* through Klarna anytime [the customer] click[s] on 'Do you want to pay with Klarna?' or similar language.") (emphasis added).  On the other hand, the language of the sentence with the hyperlinks suggests that a customer is bound by the Services terms by clicking on the "Pay with Klarna" button.  *See* ECF No. 20-4 at 2 ("By continuing, I accept Klarna Services terms. . .").  Yet a customer could click on the "Pay with Klarna" button and still choose not to move forward with inputting her payment information and using Klarna to pay for an item.  *See* ECF No. 20-1 at 10 & Riffe Decl., ¶ 17 (noting that a customer would be "free" to exit the widget before confirming the purchase without incurring any fee or penalty).  Thus, it is difficult to see how, merely "[b]y continuing" through selection of the Pay with Klarna button, the customer would actually become bound by Klarna's Services Terms.  Indeed, at oral argument, Klarna was unable to provide a precise answer as to when Klarna believes an enforceable contract is formed.  If the temporal relation between agreeing to the terms and conditions and the formation of a contract between the parties is unclear even to Klarna, it defies logic to argue that a "reasonably prudent" Internet user would understand the import of each click she initiated.

B.  Klarna's Widget

The second time Klarna believes Plaintiff entered an agreement to arbitrate was when she inputted her debit card information in Klarna's checkout widget and completed the transaction. This would have been accomplished using Klarna's widget pictured here:





The widget screen is far less cluttered than the screen discussed above, and more closely resembles the screen in *Meyer* than that in *Nicosia*. However, the "payment terms" text remains gray on a white background. The hyperlink is not blue but simply black and underlined. There is other text on the screen that is blue, but this text is not related to the terms and conditions to which

Plaintiff is supposedly agreeing.

What dooms Klarna with respect to the widget, however, is the explicit language on the page.  The statement on this screen says simply, "I agree to the payment terms." Unlike on the initial Gamestop payment options page, there is no prefatory clause in the widget that says "By continuing, I accept" the payment terms.  *Compare* ECF No. 20-4 at 2 *with* ECF No. 20-7 at 3.  It is difficult to conclude that a standalone sentence referencing "payment terms" without language manifesting assent is sufficient to "alert reasonable consumers to the gravity of the clicks" they are about to make.  *Applebaum*, 263 F. Supp. 3d at 466.  There is nothing anywhere on the screen that would alert a reasonable user to the fact that clicking "confirm and continue" has any contractual significance at all, much less acceptance of a contract that includes an arbitration agreement.  *See id.*; *see also Anand v. Heath*, No. 19-CV-00016, 2019 WL 2716213, *4 (N.D. Ill. June 28, 2019) (finding no inquiry notice when "the website did not include language explaining that clicking the 'Continue' button would constitute assent to the terms and conditions or that continuation was conditioned on such assent" and "the mere proximity of a terms and conditions hyperlink to a button that the user must click to proceed does not equate to an affirmative manifestation of assent to the terms and conditions").

In fact, the language here is nearly identical to the language that the court in *Applebaum* found insufficient to put the user on inquiry notice.  There the court found that "I agree to Lyft's Terms of Service" did not provide the user enough information to understand that by clicking the button to continue, the user was agreeing to the terms of service.  Here, Klarna's language—"I agree to the payment terms"—fares no better.  Both of these statements stand in contrast to those that courts have accepted as providing proper inquiry notice.  *See, e.g., Meyers*, 868 F.3d at 78 ("*By creating an Uber account*, you agree to the TERMS OF SERVICE & PRIVACY POLICY.")

(emphasis added).  With no language connecting this click to the to the payment terms, Plaintiff cannot be said to have consented to the arbitration agreement by clicking "confirm and continue" in the widget.

    C.  <u>Klarna's App</u>

Finally, Klarna claims that when Plaintiff downloaded its app and logged into it, she agreed to the terms and conditions, including the agreement to arbitrate.  ECF No. 20-1 at 11; Riffe Decl., ¶¶ 18-19.  Specifically, when Plaintiff opened Klarna's app for the first time after downloading it on December 27, 2020, she would have been confronted with the following screen:



Riffe Decl., Ex. 6, ECF No. 20-8. Klarna's App presents the user with the options to "Sign up," "Log in," or "Pay in-store." *Id.*[4] Below those options, in white text on a black background, are two messages. The first states: "message and data rates may apply." *Id.* The second states: "by clicking 'Sign in' I approve <u>Klarna's User Terms</u> and confirm that I have read <u>Klarna's Privacy Notice</u>. Links in the app are sponsored." Klarna clarified at oral argument that, in addition to downloading Klarna's app, Plaintiff used it for purchases after December 27, 2020, so by implication she would have proceeded through the screen depicted in ECF No. 20-8 at least once.[5]

Turning to the clarity and conspicuousness of the terms, as available through the hyperlinks, the Court finds that the app's introductory screen would not have provided a reasonable user with inquiry notice of the agreement. While the text containing the hyperlinks is white on a black background, it is also smaller than the text on the buttons. Once again, the hyperlinks are underlined, but are not blue or any other color that would make them stand out from the remainder of the sentence. As with the widget screen, however, it is the actual text of the app's sign in page that precludes a conclusion that a reasonable user would have inquiry notice. The text states "By clicking 'Sign in' I approve <u>Klarna's User Terms</u> and confirm that I have read <u>Klarna's Privacy Notice</u>." Initially, the Court notes that the word "approve" is not synonymous with the word "agree," and a reasonably prudent person may not realize that proceeding would bind her to a legal

---

[4] Riffe's initial declaration contained conflicting information regarding what exact words would have appeared on the introductory screen, as noted by Plaintiff's opposition brief. *See* ECF No. 21 at 8-9 (noting that Riffe Declaration said the screen stated, "By proceeding, I accept the <u>Klarna Shopping Service</u> and confirm that I have read <u>Klarna's Privacy Notice</u>," while the screenshot provided in fact said "By clicking 'Sign in' I approve <u>Klarna's User Terms</u> and confirm that I have read <u>Klarna's Privacy Notice</u>." Riffe Decl., ¶ 17; ECF No. 20-8. In reply, however, Defendant clarified that the screen shot provided in ECF No. 20-8 contained an accurate representation of what Plaintiff would have seen when she opened the app and that the language used in Riffe's initial declaration was simply a scrivener's error. *See* ECF No. 22 at 8, n.5 & ECF No. 22-1 (Supplemental Riffe Declaration). At oral argument, Plaintiff did not press its earlier position that the misstatement in Riffe's first declaration creates a material issue of fact for the Court to decide. Even if Plaintiff had, the Court finds that ECF No. 20-8 is an accurate depiction of the Klarna app on December 27, 2020.

[5] Plaintiff disputes that she would have seen the screen more than once, as the app may have saved her preferences on subsequent logins, but does not dispute that she would have seen it upon her first use of the app.

contract.  The larger problem, though, is that there is in fact no button that says "Sign in."  There is a "Sign up" button, a "Log in" button, and a "Pay in-store" button.  But, by the plain terms of the screen itself, there was no available "Sign in" button that a user could click to confirm she had approved the user terms and read the privacy notice.

Klarna argues that such a typographical error would not prevent a reasonable user from understanding that by proceeding, the user was agreeing to the terms and conditions.  ECF No. 22 at 12, n.5.  The Court does not credit this argument.  Had Klarna's app specified that "By clicking sign up I approve Klarna's User Terms…," a reasonable user could have assumed that Klarna's decision to specifically mention the "sign up" button would have excluded any other buttons on the screen from manifesting a commitment to approval of the User Terms.  Put another way, if the app had read, "By clicking sign up I approve Klarna's User Terms . . . ," a reasonable user could assume that, by clicking "Log in" or "Pay in-store," the user was not in fact approving the User Terms.  But by referencing a "Sign in" button when none exists, Klarna has created significant confusion over which button or buttons would commit the user to the User Terms and, as relevant here, the arbitration agreement.

A reasonable user may have understood that by proceeding, she would be bound by the terms and conditions.  A reasonable user may also have believed that only by using the sign-up or log in buttons would she be bound, but that by using the pay in store button she would not.  A reasonable user could also have believed that since she was not clicking a button labeled "sign in," she was not bound no matter what she selected.  Such uncertainty cannot form the basis for reasonable notice.  Regardless of whether the obfuscation was intentional or not, the screen is simply too puzzling for the Court to find that it would have provided a reasonable user with inquiry notice of Klarna's terms and conditions.

D.  Repeated Notices

Finally, at oral argument, Klarna noted that presenting the same terms to Plaintiff numerous times throughout this process makes it more likely that a reasonable user would have understood she was agreeing to the terms and conditions.  Once again, Klarna's argument is undone by the text of the screens themselves.  Specifically, while Klarna does post some sort of notice on multiple different pages requiring the user to click different buttons to manifest assent, the agreements are never referred to by the same names.  On the Pay with Klarna screen, the documents are referred to as "Klarna Service Terms, Privacy Policy, [and] Pay Later in 4 terms."  ECF No 20-4.  On the Widget screen, the user is directed to the "payment terms."  ECF No. 20-7 at 3.  On the app log in page, the hyperlinks are to "Klarna's User Terms" and "Klarna's Privacy Notice."  While Klarna asserts that each of these links lead to the same documents, Klarna also acknowledges that Plaintiff never actually opened any of the hyperlinks.  Thus, by virtue of Klarna's labeling convention, it is likely that a reasonable user would understand each of these links to lead to a different agreement.  While this does not prevent Plaintiff from being on inquiry notice, nor can it be said that Klarna has repeatedly notified Plaintiff of the same terms, leading to some type of compounding effect.  Therefore, the purported repeated notification does not overcome the other deficiencies outlined above.

## IV.    CONCLUSION

For the reasons described herein, Klarna's Motion to Compel Arbitration is DENIED.  The parties are directed to submit a Rule 26(f) report no later than **March 8, 2022**.  Klarna is further directed to submit an answer or other response to the complaint no later than **April 1, 2022**.

**SO ORDERED** at Hartford, Connecticut, this 15th day of February, 2022.


       _/s/ Sarala V. Nagala_
       SARALA V. NAGALA
       UNITED STATES DISTRICT JUDGE